Foster *v.* Schmitt, Appellant.

Submitted November 22, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*I. Bernard Rotberg,* for appellant.

*Milford J. Meyer,* and *Brodsky, Brodsky & Brodsky,* and *Meyer, Lasch, Hankin & Poul,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, March 15, 1968:

This case presents still another variation of the oft-litigated theme in which the "devoted friend" and her courtroom adversary, the decedent's relative, clash over the estate of a poor elderly lady who lived in filth and squalor, but actually owned quite a bit of money.

On August 27, 1957, Ella Conway, the decedent, had a sum of money in an account at the Western Savings Fund Society. It is undisputed that on that date she executed a power of attorney over the account in favor of her close friend and companion for many years, the appellant, Margaret Morgan Schmitt. On March 10, 1961, pursuant to this power of attorney, the appellant withdrew decedent's entire balance and redeposited it in a new account titled only in the appellant's name. There the money remained until June 12, 1964 when it was withdrawn in cash by Mrs. Schmitt.

With the recitation of these facts, the area where the parties' respective stories converge comes to an abrupt end. Following a trial in equity, the chancellor concluded that appellee, Margaret Foster (decedent's executrix, niece, and sole beneficiary under Ella Conway's will), was entitled to have a trust impressed upon the money found to have been misappropriated by appellant for her own use. Mrs. Schmitt was thereafter ordered to pay $8,796.35 with interest thereon from June 12, 1964 to the appellee. It is from this decree that Mrs. Schmitt appeals.

According to appellee, the March 10, 1961 transaction, in which appellant withdrew decedent's funds from Western Savings Fund, was accomplished without the knowledge or consent of Ella Conway. Mrs. Schmitt, however, vigorously maintained throughout these proceedings that Ella Conway not only consented to this withdrawal, but in fact accompanied her to the bank to facilitate the transaction. According to appellant, Ella Conway wished her to have not only control but also actual possession of the money because at that time Miss Conway was being pressed by the Philadelphia Department of Licenses and Inspections to make some much needed repairs to her property. Apparently decedent felt that she could escape the

Department if it appeared she had no money, and according to appellant, Miss Conway told her that she (Mrs. Schmitt) would receive all the money in any event when decedent died.* Although the record is unclear as to whether Miss Conway did or did not know of the March 10, 1961 transaction, we find a resolution of this controversy unnecessary, for even assuming that decedent knew of and consented to the transfer of funds, Mrs. Schmitt still cannot prevail.

In May of 1964 decedent was hospitalized. It was also at approximately this time that she began to make demands on appellant for the return of her money. It was admitted by Mrs. Schmitt that Miss Conway, on several occasions, demanded that the money be returned. Mrs. Schmitt, however, claimed, and sought to prove, that she did in fact return the money to Ella Conway about six months before the latter's death on January 18, 1965. According to appellant, the June 12, 1964 cash withdrawal was made in contemplation of the money's return, which allegedly took place on July 15, 1964. The chancellor chose to disbelieve appellant's contention that the money had been returned.

We see no reason to disturb this finding of fact. Not only was Mrs. Schmitt's story patently incredible (she claimed to have entered Miss Conway's house, spread $8,000 in cash on decedent's bed, and left without obtaining any receipt whatsoever), but appellee also produced witnesses who testified that they were in decedent's house on July 15, 1964 and that appellant never returned the money on that day. Mrs. Schmitt also argued, both at trial and in her appellate brief, that the March 10, 1961 transaction was a valid inter

---

* As of March 10, 1961, appellant was sole beneficiary under decedent's 1958 will. This will was subsequently revoked, and a new will, naming appellee as sole beneficiary, was signed in 1965.

vivos gift. We agree with the chancellor that such was not the case.

Assuming, arguendo, that the March 10, 1961 transaction was made with the full cooperation of Ella Conway, we must decide exactly what the decedent intended to be the effect of this transfer of funds from an account over which appellant had merely a power of attorney, to one titled solely in appellant's name. The answer to this question is supplied by Mrs. Schmitt's own words, both at trial and on deposition. Mrs. Schmitt has admitted throughout this case that she always believed the money to belong to Ella Conway. When asked first about the original creation of the power of attorney in 1957, she responded as follows: "Q. [By Mr. Blumstein, for appellant] Now, at the time that you became what you consider to be the power of attorney, who did you understand was the owner of that money? A. Ellie. Q. And what did you understand your function was as power of attorney? A. Well, I understood it was to remain that way. It was Ellie's money. Q. And what were you supposed to do as power of attorney; what task were you supposed to perform; what were you supposed to do? A. Well, if Ellie wanted anything, I would make withdrawals. . . ." (record at 165). Even more significant is the fact that Mrs. Schmitt continued to believe that the money belonged to Ella Conway when it was transferred to appellant's own account on March 10, 1961: "Q. [By Mr. Blumstein] In March of 1961, when the account which was in Ella Conway's name was subsequently transferred over to you, who did you understand was the lawful owner of the money? A. Ellie Conway. Q. Even though it was in your name? A. Yes, sir, I did. Q. And even though it was in your name, you were holding it for Ella Conway? A. Yes, sir." (record at 173). Not only does this testimony, in

appellant's own words, and on examination by her own attorney, completely refute her theory that the March 10, 1961 transfer was an inter vivos gift, but it also brings this case squarely within both the facts and the rule cited in *Silver v. Silver,* 421 Pa. 533, 219 A. 2d 659 (1966).

In *Silver,* plaintiff (Mrs. Silver) had transferred certain property to her two sons, but it was understood that the property was to continue to belong to Mrs. Silver. The reason for the transfer was that Mrs. Silver, a widow, was about to remarry and was fearful that the property would pass to the heirs of her husband-to-be. Mrs. Silver and her two sons agreed that the property was to be formally reconveyed to plaintiff whenever she so requested. When this request was subsequently made and refused, Mrs. Silver was successful in having a constructive trust imposed by equity upon the property. This Court affirmed the chancellor, holding that the trust could be imposed, even though the transfer on its face was absolute, provided plaintiff could show that there existed a confidential relationship between herself and the defendants, that the transfer was accompanied by a promise to reconvey, and that this promise was relied upon by plaintiff. Just as we found these requirements present in *Silver,* so also are they clearly present here.

There is no doubt that a confidential relationship existed between Ella Conway and Margaret Schmitt. As we said in *Silver*: "Although no precise formula has been devised to ascertain the existence of a confidential relationship, it has been said that such a relationship is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." 421 Pa. at 537, 219 A.

2d at 662. Using this language as a guideline, both the chancellor and this Court agree that the requisite confidential relationship existed between Mrs. Schmitt and Miss Conway. Not only was Mrs. Schmitt a constant companion of the decedent from 1918 until six months before Miss Conway's death, but defendant herself testified that she administered practically all of decedent's personal and business affairs during the waning years of Ella Conway's life. Finally, given the circumstances of this case, if there be any clearer indicia of a confidential relationship than the giving by one person to another of a power of attorney over the former's entire life savings, this Court has yet to see such indicia.

.   Nor can there be any doubt whatsoever that both parties understood that appellant was to return the money to decedent whenever Miss Conway so requested. Not only did Mrs. Schmitt candidly admit that the money belonged to Miss Conway, but she also stated of record that she had agreed to make withdrawals for Ella if asked to do so. Just as in *Silver*, a surface transfer of property took place in order that the transferror's possessions would remain safe from some third party (in *Silver*, plaintiff's husband's heirs, in the present case, the Department of Licenses and Inspections). Just as in *Silver*, the putative transferee agreed that true ownership would not change and that physical possession would be surrendered on demand. Just as in *Silver*, the promise to reconvey was breached when demand was eventually made.

Finally, it is clear from the testimony of all witnesses that Ella Conway, throughout her last years, relied on this promise to recovery. She lived in filth! and squalor, completely dependent on Mrs. Schmitt to sustain her with the money entrusted to a woman thought to be a devoted friend. But no such sus-

tenance ever came. Ella Conway eventually drew a new will, obviously relying on appellant's promise to reconvey the money—for without this money she had no estate whatsoever to give away at death.

We therefore agree that the court below, relying on *Silver,* correctly declared Mrs. Schmitt to be holding $8,796.35 as trustee for plaintiff.

Decree affirmed. Costs to be borne by appellant.

Mr. Chief Justice BELL concurs in the result.