**Kidd v. Biscuit**

C.P. of Cumberland County, no. 00-0213, Equity Term.

*Robert L. O'Brien,* for plaintiff.
*William A. Duncan,* for defendant.

OLER JR., *J.,* December 28, 2001—In this unfortu-
nate equity case, a mother has sued her son for recon-

veyance of certain realty which she alleges was transferred subject to a constructive trust[1] and for damages in the form of rent arising from the son's use of part of the property for storage.[2] The son has counterclaimed for return of certain items of personal property allegedly withheld by the mother and for compensation for other items allegedly sold by her.[3]

A trial in this matter was held on June 4, 2001, and August 23, 2001. The trial transcript was prepared and filed at the request of counsel for the parties. Proposed findings of fact and conclusions of law were submitted of record as of October 30, 2001.

For the reasons stated in this opinion, both parties will be afforded partial relief.

## FINDINGS OF FACT

(1) Plaintiff is Shirley E. Kidd, 61; she resides at 60 Quarry Hill Road, Newville, Penn Township, Cumberland County, Pennsylvania.[4]

(2) Defendant is Louis S. Biscuit Jr., 41; he resides at 118 Springfield Road, Newville, Cumberland County, Pennsylvania.[5]

---

1. See plaintiff's first amended complaint, filed January 11, 2001 (Count I).

2. See *id.* (Count II).

3. Defendant's answer, new matter and counterclaim, filed February 8, 2001 (counterclaim).

4. N.T. 3-4, trial, June 4, 2001, and August 23, 2001; see plaintiff's exhibit 4, trial, June 4, 2001, and August 23, 2001.

5. N.T. 81-82.

(3) Plaintiff is the natural mother of defendant[6] and the adoptive mother of a 14-year-old child named Corey A. Kidd.[7]

(4) Corey arrived as a foster child in plaintiff's home in 1990,[8] and was adopted by her and her then-husband (James Kidd) in 1994.[9] Plaintiff and her husband were subsequently divorced, and Corey and plaintiff presently live alone at plaintiff's 60 Quarry Hill Road address in Newville, Pennsylvania.[10]

(5) Corey has "reattachment disorder," attention deficit hyperactivity disorder, oppositional disorder, cerebral palsy and a degree of mental retardation; however, he was described as progressing successfully in the seventh grade of school as of the trial herein.[11]

(6) The property where plaintiff and Corey live on Quarry Hill Road in Newville contains a three-bedroom modular home, a 24-by-35-foot, single-story, vinyl-sided, two-car garage, a partially completed 17-by-42-foot, concrete block/wood building, with a loft, attached to the garage, and an outdoor, 10-by-10-foot, crushed-stone parking area.[12] Plaintiff purchased the land in 1985 in

6. N.T. 4. Plaintiff's first husband, the natural father of defendant, died in 1979. N.T. 5. Plaintiff married her second husband, James Kidd, in 1988. N.T. 5-6. They were later divorced. N.T. 3.

7. N.T. 9; see plaintiff's exhibit 3, paragraph 2B. Corey was born on October 26, 1987. N.T. 9. Plaintiff is also the natural mother of an adult daughter, who lives in New Jersey, and the adoptive mother of an adult son, who lives in Florida. N.T. 4-5, 12.

8. N.T. 7-8.

9. N.T. 8-10.

10. N.T. 3-4, 9.

11. N.T. 10-11. He is in a learning support class. N.T. 11.

12. N.T. 4, 16, 65-68.

her own name,[13] had the modular home constructed in 1986,[14] and has lived there since then.[15] The garage was constructed in 1994, and the block building was under construction by 1996.[16] The property is worth about $137,000[17] and is subject to a mortgage.[18]

(7) In November of 1992, defendant commenced residence in the basement of the modular home, and helped construct the two-car garage on the premises.[19] He later moved into one of the bedrooms.[20]

(8) At about the same time that defendant began residing at plaintiff's property, plaintiff became a foster parent for a child named Alex, who had been born on October 24, 1992.[21]

(9) In 1996, defendant adopted plaintiff's foster child Alex.[22] Plaintiff, however, was the primary caretaker for Alex.[23]

(10) While he lived in plaintiff's home, defendant paid for his room and board; after adopting Alex, he also paid for Alex's room and board;[24] by June of 1998, defendant was paying plaintiff $500 every two weeks.[25]

---

13. Plaintiff's exhibit 4.
14. N.T. 4.
15. N.T. 4.
16. N.T. 68-69.
17. Plaintiff's exhibit 6.
18. See N.T. 50-51. The balance due on the mortgage does not appear to be of record.
19. N.T. 13-16.
20. N.T. 17, 82, 99.
21. N.T. 20.
22. N.T. 20, 101.
23. N.T. 20-23.
24. N.T. 21.
25. N.T. 48-49; defendant's exhibit 1.

(11) Plaintiff trusted defendant and felt that their relationship was a good one.[26]

(12) In May of 1998, plaintiff was diagnosed with cancer, which she believed to be fast-spreading and terminal.[27]

(13) Plaintiff was concerned as to the future of Corey in view of her illness, and discussed this concern on several occasions with defendant.[28]

(14) Defendant indicated to plaintiff that if something happened to her he would feel obligated to take care of Corey.[29]

(15) In this regard, defendant suggested to plaintiff that defendant's name be placed on the deed to the property. According to testimony of plaintiff, which the court finds credible:

"[Defendant] told [plaintiff] that he had talked to a lot of people, and he was advised that [plaintiff] should put his name on the deed [to the Quarry Hill Road property] now so he wouldn't have a hard time getting things settled, and he could take care of the boys [*i.e.,* Corey and Alex] if something happened and stay there." [30]

(16) On June 2, 1998, prior to surgery for the cancer, plaintiff executed a will containing, inter alia, the following statement:

"Any money due me from Allstate Insurance Company from the settlement of my accident case and all other money remaining after my expenses have been paid

---

26. See N.T. 23.
27. N.T. 24.
28. N.T. 26.
29. N.T. 106.
30. N.T. 28.

shall be divided equally between my four children. . . . Any money passing to my son Corey shall be held in trust by [defendant] Louis [S. Biscuit Jr.,] who, as his guardian has promised that he will care for Corey as long as he possibly can and will use these funds and the social security benefits to provide for Corey."[31]

(17) On the same date, June 2, 1998, plaintiff also executed, as grantor, a deed to the Quarry Hill Road property to herself and defendant, as grantees, reserving to herself a life estate and quitclaiming the balance of her interest in the property to defendant.[32]

(18) The deed and will were prepared by plaintiff's attorney.[33]

(19) The deed contains no mention of the parties' understanding as to the purpose of the transfer.[34]

(20) The deed was recorded in the Office of the Recorder of Deeds in and for Cumberland County, Pennsylvania, on June 4, 1998.[35]

(21) By virtue of the relationship of parent and child, the trust which plaintiff had developed in defendant, and the known exigencies of plaintiff's situation in terms of her expected death in the near future and the need to provide for defendant's severely handicapped brother, a confidential relationship existed between plaintiff and defendant with respect to this transaction.

---

31. Plaintiff's exhibit 3, paragraph 3B.

32. Plaintiff's exhibit 4. The evidence does not suggest that monetary consideration was involved for the transfer. The deed recites a nominal figure of $1. *Id.*

33. See N.T. 33; plaintiff's exhibits 3-4.

34. See plaintiff's exhibit 4.

35. Plaintiff's exhibit 4; it was recorded in deed book 178, page 723.

(22) Plaintiff underwent surgery for her cancerous condition a few days later.[36]

(23) Shortly thereafter, as plaintiff recuperated, defendant told plaintiff's sister that as soon as plaintiff died "[Corey's] outta here."[37]

(24) When confronted by plaintiff about this statement, defendant told her that he did not want Corey and could not take care of him.[38]

(25) In fairness to defendant, it should be noted that this position was prompted by defendant's realization that caring for Corey would be a full-time job and would necessitate his leaving his employment.[39]

(26) In testimony at the trial in this case, defendant indicated that he does not intend to care for Corey after plaintiff's death.[40]

(27) After plaintiff's conveyance of the remainder interest in the property to defendant and following her surgery, defendant's attitude toward plaintiff changed, in that he became more distant and acted as if "he didn't want [her] around."[41]

(28) Defendant basically stopped giving money to plaintiff[42] and instead paid expenses related to the prop-

---

36. See N.T. 30.

37. N.T. 124.

38. N.T. 124; see also, N.T. 33, 123, 125.

39. N.T. 106-107.

40. N.T. 117-18. Defendant's testimony was to the effect that he had made this position clear to plaintiff prior to her conveyance of the property to him and that she had proceeded with the transfer anyway. N.T. 117-20.

41. N.T. 32.

42. N.T. 32; see defendant's exhibit 1.

erty, such as mortgage payments, directly to the obligees.[43]

(29) As it developed, the severity of plaintiff's condition had been misapprehended[44] and her health is presently monitored by way of periodic CAT scans and blood tests.[45]

(30) During the 16 months following plaintiff's surgery in June of 1998, until September of 1999, defendant continued to reside with plaintiff upon the property, and made mortgage payments on the property, in the amount of $7,278.50, and other payments benefiting the property, in the amount of $4,889.74,[46] for a total of $12,168.24.[47]

(31) In June of 1999, a woman who would later become defendant's wife joined defendant in residence on the property, with her two children.[48]

(32) In September of 1999, defendant approached plaintiff with a suggestion that she and Corey live elsewhere. According to her testimony, which the court finds credible:

"He just came in one—the night after he returned off the road, and he says, two families can't live in the same house. I said, well, I realize that. And he says, I've been up two nights trying to figure out how to build you a house. I says, I don't need a house. I says, if you want to

43. See defendant's exhibit 2.
44. N.T. 24.
45. N.T. 33; see N.T. 35-36.
46. Defendant's exhibit 2.
47. N.T. 92-93; defendant's exhibit 2.
48. N.T. 35, 37, 89.

build a house, build one for your family, if you're having one."[49]

(33) The following day, defendant moved from the residence occupied by plaintiff to his present address.[50]

(34) The parties have been essentially estranged since that time,[51] and plaintiff has been paying the expenses, including the mortgage, related to the Quarry Hill Road property where she lives with Corey.[52]

(35) The court finds that plaintiff has proven, by direct, positive, express and unambiguous evidence, that plaintiff's conveyance of a remainder interest in her property at 60 Quarry Hill Road, Newville, Penn Township, Cumberland County, Pennsylvania, was subject to a constructive trust designed to benefit plaintiff's son Corey A. Kidd as aforesaid and that defendant does not intend to give effect to the trust.

(36) Various items of personalty owned by defendant have been stored in the garage and block building and on the parking area of the Quarry Hill Road property.[53]

(37) By letter dated May 19, 2000, plaintiff put defendant on notice that in the absence of rental payments he would no longer be permitted to store items on the property during her life tenancy.[54]

(38) However, when defendant appeared on the property in August 2000, he found that the lock on the garage had been changed.[55]

---

49. N.T. 36.
50. N.T. 35-36, 51, 89.
51. N.T. 38-39.
52. See N.T. 51.
53. N.T. 13, 95.
54. Plaintiff's exhibit 8.
55. N.T. 95.

(39) According to defendant, it will take about a month for him to remove the items.[56]

(40) The court finds that plaintiff has not sustained her burden of proving an obligation on the part of defendant to pay rental to her for past storage of personalty.

(41) The evidence presented also did not support defendant's contention in his counterclaim that plaintiff had sold any of his personalty.

## DISCUSSION

*Statement of law.* Pennsylvania's rationale for the constructive trust doctrine has been expressed by the Superior Court as follows:

"The Supreme Court has said that a constructive trust 'is not really a trust at all but rather an equitable remedy.' . . . As such, it 'is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' . . . A constructive trust may arise 'even though the acquisition of property was not wrongful and the defendant's intention was not malign. Our courts focus not on intention, but on the result of unjust enrichment.'" *Gee v. Eberle,* 279 Pa. Super. 101, 112, 420 A.2d 1050, 1056 (1980) (citations omitted); see *Hercules v. Jones,* 415 Pa. Super. 449, 453-54, 609 A.2d 837, 839-40 (1992).

"Additionally, it should be noted that a constructive trust for realty can be based upon oral evidence because statutory law specifically exempts trusts arising by 'im-

---

56. N.T. 96.

plication or construction of law' from the statute of frauds." *Friday v. Friday,* 311 Pa. Super. 17, 21, 457 A.2d 91, 93 (1983) (quoting Act of April 22, 1856, P.L. 532, §4, 33 P.S. §2 (1967) (citing *Truver v. Kennedy,* 425 Pa. 294, 229 A.2d 468 (1967); *Silver v. Silver,* 421 Pa. 533, 219 A.2d 659 (1966)).

Two grounds for imposition of a constructive trust have been discussed by the Pennsylvania Superior Court in *Kohr v. Kohr,* 271 Pa. Super. 321, 413 A.2d 687 (1979):

"In accordance with the case law of this Commonwealth, a constructive trust may be decreed under two different theories. . . . [First,] a constructive trust arises if a transferee conveys property to another as a result of 'fraud, duress, undue influence or mistake, or . . . the transferee at the time of the transfer was in a confidential relation to the transferor . . . .' [*and*] the fraud, duress, undue influence or abuse of a confidential relationship [has been] accompanied by an actual promise by the transferee to hold the property in trust and a reliance upon that promise by the transferor. . . .

"[Second, a] constructive trust may arise '[w]here a person holding title to property is subject to an equitable duty to convey it to another on the grounds that he would be unjustly enriched if he were permitted to retain it. . . .' [T]his theory does not require an express promise to hold property in trust. Rather, '[t]he imposition of a constructive trust is an equitable remedy designed to prevent unjust enrichment.'" *Id.* at 328-29, 413 A.2d at 690-91. (citations omitted) (emphasis added)

The existence of a confidential relationship is generally "a question of fact to be determined by no [in]flexible rule but by a weighing of the particular factors present in

[the] case." *DePaul v. DePaul,* 287 Pa. Super. 244, 248, 429 A.2d 1192, 1194 (1981) (quoting *Stauffer v. Stauffer,* 465 Pa. 558, 569-70, 351 A.2d 236 (1976)). "The existence of a close family relationship . . . does not per se justify recognition of a confidential relationship." *Id.* at 249, 429 A.2d at 1194. However, it is a factor to be considered among the totality of circumstances. See *Silver v. Silver,* 421 Pa. 533, 537, 219 A.2d 659, 662 (1966); see generally, *Friday,* 311 Pa. Super. 17, 457 A.2d 91. In general, a confidential relationship may be found where "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on the one side, or weakness, dependence or justifiable trust, on the other." *DePaul,* 287 Pa. Super. at 249, 429 A.2d at 1194 (quoting *Moreland v. Metrovich,* 249 Pa. Super. 88, 95, 375 A.2d 772 (1977)).

Thus, it has been held that a constructive trust may be imposed, in an appropriate case, upon realty transferred by one family member to another upon an oral understanding that the property would be maintained as a home for the children of the family and would inure to their benefit. See *Friday,* 311 Pa. Super. 17, 457 A.2d 91.

As a general rule, "oral trusts [in land] are viewed with disfavor by the law, [and] a proponent of such trust is under a heavy burden of proving the same by evidence which is direct, positive, express and unambiguous. . . ." *Brunier v. Stanert,* 369 Pa. 178, 183, 85 A.2d 130, 133 (1952). One effect, however, of the existence of a confidential relationship between the parties is a shift in the burden of proof to "the party benefiting from the transaction [to show] that he took no unfair advantage of his

relationship with the other." *DePaul,* 287 Pa. Super. at 249, 429 A.2d at 1194 (quoting *Stauffer,* 465 Pa. at 569-70, 351 A.2d at 236).

Where a court of equity finds that a property is subject to a constructive trust, it is necessarily vested with broad powers in terms of the remedy to be decreed.[57] "A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief." *Chambers v. Chambers,* 406 Pa. 50, 55, 176 A.2d 673, 675 (1962) (quoting *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 122 N.E. 378, 380-81 (1979)). In the context of a constructive trust allegedly arising out of a confidential relationship, the Superior Court has quoted with approval the following commentary:

"If the theory of constructive trusts arising out of violation of confidential relations is that the trusted grantee is forbidden to acquire any selfish profit or benefit during his administration, and not hold all such benefits for the grantee, then where A, who is in a confidential relation with B, conveys to B an oral trust for C, and B refuses to perform, the property should be returned by B to A . . . ." *Friday,* 311 Pa. Super. at 21-22, 457 A.2d at 93 (quoting Bogert, Trusts and Trustees §496 (2nd ed. rev. 1978)). (emphasis omitted)

*Application of law to facts.* In the present case, a number of circumstances militated in favor of finding that the Quarry Hill Road property sub judice was subject to a constructive trust. These included the close family re-

---

57. "[O]nce a court of equity assumes jurisdiction [in a constructive trust case], it may fashion whatever relief is appropriate. . . ." *Friday,* 311 Pa. Super. at 22-23, 457 A.2d at 93 (Beck, J., concurring and dissenting).

lationship that existed prior to the conveyance from plaintiff to defendant, the dependence of plaintiff upon defendant created by exigencies regarding the (assumed) imminence of her death and Corey's special needs, defendant's prompting of plaintiff to donate an interest in the property to him, and defendant's express promise to use the conveyance to take care of Corey. A reconveyance of defendant's interest to plaintiff is an appropriate remedy for defendant's decision not to utilize the property in accordance with the parties' understanding, to correct the inequity of a promise unkept under the circumstances and to prevent unjust enrichment.

On the other hand, the remedy should not result in a windfall to plaintiff or a forfeiture on the part of defendant, with respect to payments made by defendant for the benefit of the property in reliance upon its conveyance to him. Based upon the foregoing findings of fact and principles of law, the following conclusions of law and decree nisi will be made and entered:

## CONCLUSIONS OF LAW

(1) The court has jurisdiction over the parties and subject matter of this litigation.

(2) A constructive trust should be impressed upon the property in which plaintiff conveyed a remainder interest to defendant at 60 Quarry Hill Road, Newville, Penn Township, Cumberland County, Pennsylvania, by deed dated June 2, 1998, in accordance with the above discussion.

(3) Defendant is entitled to reimbursement by plaintiff for expenditures directly benefiting the property following its conveyance to him and made in reliance upon the conveyance.

(4) Defendant is entitled to a reasonable period within which to remove his personalty from the property.

(5) Neither party is entitled to any additional relief.

## DECREE NISI

And now, December 28, 2001, upon consideration of plaintiff's amended complaint and defendant's counterclaim in the above-captioned matter, following a trial held on June 4, 2001, and August 23, 2001, and for the reasons stated in the accompanying opinion, it is ordered, adjudged and decreed as follows:

(1) In accordance with the accompanying opinion, a constructive trust is impressed upon defendant's remainder interest in the property located at 60 Quarry Hill Road, Newville, Penn Township, Cumberland County, Pennsylvania, which is the subject of a deed from plaintiff to plaintiff and defendant dated June 2, 1998, and recorded in the Office of the Recorder of Deeds in and for Cumberland County, Pennsylvania, in deed book 178, page 723.

(2) Within 60 days of the date of a final decree herein, defendant shall reconvey by quitclaim deed his remainder interest in the said property to plaintiff; provided, that plaintiff shall have paid to defendant the sum of $12,168.24 within that period.

(3) Plaintiff shall permit defendant, his agents, servants and representatives, to remove his personalty from the property during a period of 30 days immediately following the date of a final decree herein.

(4) All other relief requested by either party is denied.

This decree nisi shall automatically become a final decree without further order of court in the absence of a timely motion for post-trial relief pursuant to Pa.R.C.P. 227.1.